## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JJK GROUP, INC.,
*f/k/a* John J. Kirlin, Inc.,

     Plaintiff,

     v.

VW INTERNATIONAL, INC. and
FIRST NATIONAL INSURANCE
COMPANY OF AMERICA,

     Defendants.

Civil Action No. TDC-13-3933

### MEMORANDUM OPINION

This matter is before the Court on a Motion for Partial Summary Judgment filed by prime contractor Plaintiff JJK Group, Inc. ("JJK"), and cross Motions for Summary Judgment filed by subcontractor Defendant VW International, Inc. ("VWI") and its surety, Defendant First National Insurance Company of America ("First National"). The case involves a government contract for the installation of a "Nurse Call System" in a United States Army medical facility. The issue before the Court is whether JJK is entitled to recover the costs it has incurred in replacing the Nurse Call System as directed by the government, or whether VWI was permitted to refuse to perform the replacement work. The Court has reviewed the pleadings and the briefs and heard oral argument on March 23, 2015. For the following reasons, JJK's Partial Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and the Motions for Summary Judgment filed by VWI and First National are DENIED.

## BACKGROUND

The following facts are not in dispute.  In January 2003, the United States Army Corps of Engineers, Engineering & Support Center, Huntsville, Alabama (the "Government") entered into an indefinite-delivery/indefinite quantity contract (the "Prime Contract") with JJK.  Moore Decl. ¶ 3, ECF No. 32-1; Mot. Partial Summ. J., Ex. 1, ECF No. 32-2.  Among other provisions, the Prime Contract contains an Inspection Clause and a Disputes Clause from the Federal Acquisition Regulations ("FAR").

The Inspection Clause makes acceptance of any work "final and conclusive, except for latent defects, fraud, or gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee."  Mot. Partial Summ. J., Ex. 1, at JJK_00430-31; *see* 48 C.F.R. § 52.246-2(k).  The Disputes Clause, FAR 52.233-1, states in relevant part:

> (b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.
> (c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract . . . . .
> (d)(1) A claim by the Contractor shall be made in writing, and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision. . . . .
> . . . .
> (i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

Mot. Partial Summ. J., Ex. 1, at JJK_00445; 48 C.F.R. 52.233-1(b)-(d), (i).

On September 26, 2007, pursuant to the Prime Contract, the Government issued to JJK a task order for the replacement of a Nurse Call System at its Madigan Army Medical Center at Fort Lewis, Washington.  Moore Decl. ¶ 4; Mot. Partial Summ. J., Ex. 2, ECF No. 32-2.  On or about January 15, 2009, JJK and VWI entered into a Subcontract Agreement (the "Subcontract")

for VWI to furnish and install the new Nurse Call System for the amount of $6,380,490.00.

Moore Decl. ¶ 6; Mot. Partial Summ. J., Ex. 4, ECF No. 32-3. Article 5 of the Subcontract states

that the Subcontract includes "[t]he agreement between the Owner [the Government] and

General Contractor [JJK], including all general and supplemental conditions, if any." Mot.

Partial Summ. J., Ex. 4, at JJK_00549. Article 8, a "Flow-Down Relationship" clause, states that

VWI is "bound to JJK in the same way JJK is to the Owner and/or General Contractor (GC) and

shall bear all the rights and liabilities with respect to JJK as JJK has with respect to the Owner

and/or GC." *Id.* at JJK_00550. Article 19 of the Subcontract, entitled "Disputes," states in

relevant part:

> A. If any such claim or dispute as to which notice is given by the Subcontractor as
> above provided arises in whole or in part out of the Contract Documents or an act
> or omission of the Owner or GC, then Subcontractor's rights as to such dispute or
> claim shall be determined solely by applicable provisions of such Contract
> Documents including any dispute procedures therein.  In the event that it is
> necessary to commence any action or proceeding against the Owner or GC to
> implement Subcontractor's rights as above described, then JJK agrees to, in its
> sole discretion, either initiate such proceeding on Subcontractor's behalf, or
> permit Subcontractor to initiate such proceeding in JJK's name, upon
> Subcontractor's written request . . . . Subcontractor, and its sureties, shall be
> bound to JJK to the same extent that JJK is bound to Owner and/or GC by the
> Contract Documents and by any decisions or determinations made under the
> Contract Documents by any board or arbitration panel.

*Id.*

As required by the Subcontract, First National issued to JJK a performance bond (the

"Performance Bond") on behalf of VWI. The Performance Bond stated, in relevant part: "NOW,

THEREFORE, THE CONDITION OF THIS OBLIGATION, is such that, if the Principal [VWI]

shall promptly and faithfully perform said subcontract, then this obligation shall be null and void;

otherwise to remain in full force and effect." Mot. Partial Summ. J., Ex. 5, at JJK_01010, ECF

No. 32-3.

On or about September 15, 2011, after VWI had installed the Nurse Call System, the Government signed a "Project Close-Out Final Acceptance Form." Moore Decl. ¶ 9; Mot. Partial Summ. J., Exs. 6-7, ECF No. 32-3. However, during the one-year warranty period following completion, which ended on August 2, 2012, the Government made demands for various repairs under the Prime Contract's warranty provision. Moore Decl. ¶¶ 10-11. On November 7, 2012, the Government emailed to JJK a lengthy list of issues that had been noted during the warranty period but remained outstanding. Moore Decl. ¶ 12; Mot. Partial Summ. J., Ex. 8, ECF No. 32-3. Among the problems identified were situations where "no new calls can be seen on the system," and where "[e]ither the staff cannot hear the patient, or the patient cannot hear the staff." *Id.* at JJK_00049. Notably, the Medical Center had received a letter "from a patient that experienced what they felt was a failure of the nurse call system that possibly endangered her husband's life." *Id.* at JJK_00050.

VWI and its subcontractor performed corrective work on the Nurse Call System between January and April 2013. Moore Decl. ¶ 14. The Government, however, reported continuing deficiencies in the Nurse Call System, including "many system errors, lockups, and failures," Moore Decl. ¶¶ 15-17; Mot. Partial Summ. J., Ex. 10, at JJK_00649, ECF No. 32-4, and revoked its prior acceptance on May 24, 2013, partly on grounds of unresolved warranty issues and partly on grounds that it had discovered previously unknown latent defects. Moore Decl. ¶¶ 15-17; Mot. Partial Summ. J., Ex. 11, ECF No. 32-4. In its letter to JJK entitled "Notice of Latent Defect, Revocation of Acceptance, and Demand for Delivery of a New System DACA87-03-D-0008 Task Order 0033 for the Nurse Call System at Ft. Lewis, WA," the Government stated that it "discovered post-acceptance that the nurse call system exhibits recurring unreliability because of internal system defects" that "represents a continuing danger to the safety of the patients at the

4

facility." Mot. Partial Summ. J., Ex. 11, at JJK_00652.  Because of "the severity of the life-safety situation," the Government revoked acceptance and instructed JJK to provide, within seven days of receipt of the letter, a corrective plan to deliver a "new, replacement system that will satisfy all task order requirements at no additional cost to the Government." *Id.*

JJK forwarded the letter to VWI the next day, along with its own letter stating that "The subject nurse call system is entirely within VWI's scope of work" and that, consequently, "Kirlin[1] expects VWI to respond to, and comply with, the Government's May 24 letter." Mot. Partial Summ. J., Ex. 12, at JJK_00656, ECF No. 32-4.  VWI responded on June 7, 2013, stating: "Without a new subcontract agreement, or an explicit withdrawal of the acceptance of work under Subcontract Agreement 75033-27[,]  .  .  .  VWI cannot continue to bear the full responsibility for refuting the Government's claim of latent defects and/or correction of other deficiencies." Mot. Partial Summ. J., Ex. 14, at JJK_00661, ECF No. 32-4.

In a follow-up letter sent on June 12, 2013, the Government stated that based "upon the considered professional opinion of our engineers," it had concluded that "the system is non-repairable." Moore Decl. ¶ 22; Mot. Partial Summ. J., Ex. 15, at JJK_00663, ECF No. 32-4. Pursuant to the FAR Disputes Clause, it ordered JJK to "immediately provide your specific commitment by 4:00 PM Central Time 14 June 2013 to replace the system at no additional cost to the Government" with a "fully operational system that meets or exceeds all elements of the existing task order," and took the position that failure to do so would be considered a "repudiation of the contract." *Id.* JJK forwarded the Government's letter to VWI the following day and requested VWI's written confirmation that it would replace the system. Mot. Partial Summ. J., Ex. 18, ECF No. 32-4.  On June 14, 2013, JJK sent a letter to the Government

---

[1] Although the Court refers to Plaintiff as "JJK" throughout the Memorandum Opinion, the documents in the record alternate between "JJK" and "Kirlin" in referring to Plaintiff.

expressing its disagreement with the Government's position that there was a latent defect in the system, but confirming its intent to comply with the Contracting Officer's order.  Mot. Partial Summ. J., Ex. 19, ECF No. 32-4.  In a letter to JJK sent on the same day, however, VWI stated that it could not "blindly accept the unilateral position that it is financially liable to replace the system because the company does not have enough information to determine whether it is at fault – or could be at fault – for the issues raised by JJK or the Government."  Mot. Partial Summ. J., Ex. 20, at JJK_00706, ECF No. 32-4.

In response, JJK stated that although the Government's revocation of acceptance due to a latent defect required it to take the same action with respect to the Subcontract, JJK was "aware of the factual, contractual and legal defenses that might be available" to both VWI and JJK, and that if either incurred additional costs as a result of the Government's order, JJK "intend[s] to submit (and will permit VWI to submit as a pass-through) a request for equitable adjustment, and a subsequent claim if necessary."  Mot. Partial Summ. J., Ex. 23, at JJK_00718-19, ECF No. 32-5.

After continued negotiations, VWI confirmed at a November 25, 2013 meeting that it refused to perform the replacement work.  Moore Decl. ¶ 37.  Thus, on December 13, 2013, JJK sent letters to both VWI and First National, stating that VWI was in default under Article 15 of the Subcontract and demanding that First National cure the default.  *See* Mot. Partial Summ. J., Exs. 32-33, ECF No. 32-5.  Article 15 provides that default occurs if VWI "fail[s] in the performance or observance of any of the covenants, conditions, or other terms of this Subcontract."  Mot. Partial Summ. J., Ex. 4, at JJK_00550.  JJK then entered into a subcontract with a different company, SimplexGrinnell, which is working to replace the Nurse Call system.

6

*See* Mot. Partial Summ. J., Ex. 35, ECF No. 32-5.  JJK filed the present suit against VWI and First National on December 31, 2013.

## DISCUSSION

### I.  Legal Standard

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006).  "A material fact is one that might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.  The Court may rely only on facts supported in the record, not simply assertions in the pleadings, to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial."  *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

When faced with cross motions for summary judgment, the court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and quotation marks omitted).  On a motion for summary judgment on a question of contract interpretation, a court first determines "whether, as a matter of law, the contract is ambiguous or unambiguous on its face," and, if the contract is unambiguous, the court "may then properly

interpret the contract as a matter of law and grant summary judgment." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (internal citation and quotation marks omitted). Here, the parties do not argue that the contract terms are ambiguous, and agree that the questions of contract interpretation are before the court as a matter of law. *See* Mot. Partial Summ. J. at 19, ECF No. 32; VWI's Cross Mot. Summ. J. at 12-15, ECF No. 34-1; First National's Cross Mot. Summ. J. at 1, 8, ECF No. 35-1.

## II. Choice of Law

Federal courts sitting in diversity apply the law of the state in which the court is located, including the forum state's choice of law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). Under Maryland law, choice-of-law provisions in contracts are considered generally valid. *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007). Here, the choice of law provision in the Subcontract states that it "shall be governed by the law of the state where JJK's office address is located as set forth above." Mot. Partial Summ. J., Ex. 4, at JJK_00552. Thus, Maryland law governs.

Under Maryland law, a court must "give force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they intended it to mean." *Hashmi v. Bennett*, 7 A.3d 1059, 1068 (Md. 2010) (internal citation and quotation marks omitted). In other words, the court interprets a contract by determining "from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* (internal citation and quotation marks omitted).

## III. The JJK and VWI Cross Motions for Summary Judgment

The Court first considers the central issue in the JJK and VWI cross motions for summary judgment: whether VWI was in default on the Subcontract. In order to determine

8

whether VWI was in default, the Court must consider (1) whether following the Government's revocation of its final acceptance of the project based on a latent defect, the Disputes Clause required JJK to replace the Nurse Call System immediately; (2) whether VWI was obligated under the Subcontract to perform the ordered replacement; and (3) whether, as VWI argues, the Government had ordered a "cardinal change" which relieved it from such an obligation. As set forth below, the Court concludes that, under the Disputes Clause, JJK was required to replace the Nurse Call System, and, under the terms of the Subcontract, VWI was therefore also required to do so. The Court concludes, however, that there is a genuine issue of material fact on the issue of whether the Government ordered a cardinal change, so it cannot find default by VWI as a matter of law.

Although JJK seeks partial summary judgment only on the issue of liability, VWI moves for summary judgment on the issue of damages, arguing that the damages sought by JJK are too speculative to be sought before the Government proves the existence of latent defects. As set forth below, the Court concludes that there is a genuine issue of material fact on the question of damages and therefore denies VWI's motion for summary judgment on damages.

### A. JJK's Obligation under the Disputes Clause

As a matter of law, once the Government revoked its final acceptance based on a latent defect and ordered JJK to replace the Nurse Call System, JJK was obligated to comply with the Government's directive. The Prime Contract's FAR Disputes Clause states, in relevant part, that a contractor "shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decisions of the Contracting Officer." 48 C.F.R. 52.233-1(i); Mot. Partial Summ. J., Ex. 1, at JJK_00445. VWI claims that JJK had no obligation to replace the system because the

9

Government had accepted the original system and that the Government had to prove the existence of a latent defect before VWI was required to comply. But case law interpreting the Disputes Clause makes clear that a government contractor must proceed with work directed by the government, even if it believes the Government's directions to be erroneous. For example, in *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260 (Fed. Cir. 1999), the government attempted to exercise an option clause to modify unilaterally the number of bombs to be demilitarized. *Id.* at 1264. The contractor argued that it was not bound to perform because the government's attempt to exercise the option was invalid. *Id.* However, because the contract contained the standard FAR 52.233-1 Disputes Clause, identical to the clause in the current case, the United States Court of Appeals for the Federal Circuit determined that the contractor was required to perform the option as directed "pending resolution of its challenge to the contracting officer's order," and held that the contractor was "obligated to deliver the option quantities until and unless it obtained a court order excusing it from its performance obligations." *Id.* at 1277.

Similarly, in *Stoeckert v. United States*, 391 F.2d 639 (Ct. Cl. 1968), the contractor refused to follow the government's directive to remove and replace at its own expense a tile floor that the government had found unsatisfactory, and elected instead to abandon the work. *Id.* at 644. The United States Court of Claims concluded that the contractor "could not justifiably abandon the work simply because of his disagreement with the contracting officer" because "[t]o the extent that [the government's] list of deficiencies constituted a change in specifications or performance of work not required by the contract, the contractor would have been entitled to an equitable adjustment in the amount due and/or in the time required for performance provided he had complied with the procedural requirements of the contract." *Id.* at 645-46. Thus, it is firmly established that, under the FAR Disputes Clause contained in the Prime Contract, a contractor

such as JJK has no choice but to comply with a contracting officer's directive such as the Government's order to replace the Nurse Call System.

VWI's argument that JJK had no obligation to replace the Nurse Call System because the Government had already issued its Final Acceptance, and nearly two years had passed before the Contracting Officer gave the order to replace the Nurse Call System, is not persuasive. The Inspection Clause in the Prime Contract states that acceptance of any work is final "except for latent defects, fraud, or gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee." Mot. Partial Summ. J., Ex. 1, at JJK_00431. Here, the Government revoked its acceptance based on both latent defects and unaddressed warranty issues. *See* Mot. Partial Summ. J., Ex. 11. When the government revokes its acceptance, the contract is reopened, and its provisions, including the Disputes Clause, apply. *Appeal of Jo-Bar Mfg. Corp.*, ASBCA No. 17774, 73-2BCA ¶ 10,311 ("Upon discovery of the defects in appellant's product after acceptance and payment of the purchase price the Government was entitled to reopen the contract and to avail itself of all provisions of the original contract, notwithstanding the prior acceptance and final payment."); *see also* John Cibinic, Jr. et al., Administration of Government Contracts 863-66 (4th ed. 2006) (stating that following revocation of acceptance, [t]he contractor's failure to correct or replace the items promptly subjects it to termination for default").

In *Becho, Inc. v. United States*, 47 Fed. Cl. 595 (Fed. Cl. 2000), the government had accepted and paid for the supply and delivery of one of two piles of riprap, a stone used to control erosion. *Id.* at 597. The court held that when the government later asserted that both piles contained stones that did not conform to the contract requirements and issued a contract modification directing the contractor to remove all nonconforming materials from both piles

without additional compensation, the Disputes Clause required the contractor to perform the work first, whether or not it agreed with the modification, then later seek an equitable adjustment. *Id.* at 598, 600 ("[The government] correctly asserts that if the additional work requested . . . was covered by the inspection and changes clause of the contract, then the disputes clause of the contract required [the contractor] to perform this work, whether or not it agreed with the modification, and later seek an equitable adjustment, if appropriate."). Likewise, here, the Government revoked its acceptance based on the specific grounds provided in the Prime Contract's Inspection Clause, and JJK was required to perform. Thus, although a contractor may later contest a government contracting officer's post-acceptance decision to order corrective performance, the Disputes Clause obligates a contractor to continue with the ordered work even while the dispute is ongoing. *See Skip Kirchdorfer, Inc. v. United States*, No. 14-80C, 1981 WL 30791, at \*3 (Ct. Cl. Nov. 6, 1981) (holding that even though felt material to be applied to a roof had been accepted by the government, once the government ordered it to be replaced based on tests showing that it failed to meet the specifications, the contractor "was not entitled to cease work and appeal" the order, but "was instead obliged to continue roofing and appeal simultaneously," regardless of "whether the Government was right or wrong").

Defendants unpersuasively claim that case law establishes that the Disputes Clause does not apply post-acceptance and that, after acceptance, the burden shifts to the government to prove latent defect before a contractor is required to act. First National's Cross Mot. Summ. J., at 11-12; Hearing on Cross Mots. Summ. J., *JJK Group, Inc. v. VW Int'l, Inc.*, No. 13-cv-3933-TDC, at 10:16:15 a.m. (D. Md. March, 23, 2015). The cases cited by Defendants do not establish this point, and some do not even appear to address the specific question presented here: whether the Disputes Clause required immediate performance.

Although Defendants cite *Spandome v. United States*, 32 Fed. Cl. 626 (1995), to argue that the Government was required to prove the latent defect before VWI was required to comply with the order, the Disputes Clause was not at issue in that case. There, following acceptance of a structure built by the contractor, the government identified latent defects and issued a default termination against the contractor for its refusal to take corrective action, so the parties were already at the stage of litigating whether the structure at issue, in fact, contained latent defects and whether the government had properly rendered a default termination. *Id.* at 635-36. That is not the posture of this case. In fact, when the court in *Spandome* concluded that there had been a latent defect, it stated that "the government was within its rights to require corrective action upon discovery of those defects" and upheld the termination for default based on the contractor's failure to comply with the government's directive. *Id.* at 635.

In *Bar Ray Products, Inc. v. United States*, 340 F.2d 343 (Ct. Cl. 1964), the court addressed whether the Government validly revoked acceptance based on fraud and was therefore entitled to financial compensation for nonconforming products, but did not address whether the Government was entitled to immediate corrective performance. *Id.* at 346-48. In fact, the court's decision explicitly acknowledged that the Disputes Clause remains relevant after acceptance. *Bar Ray*, 340 F.2d at 345 n.2 ("[I]n cases involving latent defects or misrepresentation amounting to fraud, action may be taken under the disputes clause after the contract has been completed, provided such action is taken within a reasonable time after the defects or fraud has been discovered.") (citing *Bar Ray Products Inc. v. United States*, 162 C. Cl. 836, 837-38 (Ct. Cl. 1963)).

In *Garrett v. General Electric Co.*, 987 F.2d 747 (Fed. Cir. 1993), where the government had accepted jet engines and then alleged latent defects, the issue was whether the Armed

13

Services Board of Contract Appeals had jurisdiction over the issue, not whether the government could order corrective performance under the Disputes Clause prior to adjudication. *Id.* at 749. Furthermore, in *Garrett*, the litigation apparently arose *after* the contractor had replaced the engines as ordered by the government under the Disputes Clause. *See Garrett*, 987 F.2d at 754 ("By the provisions in the contract, the government was entitled to demand replacement of latently defective goods, and the contractor was required to satisfy that demand *prior to* resolution of any dispute respecting the asserted latentness of the defects . . . .   Given the performance by GE in this case, the [government's] demand for GE to perform was satisfied.") (Nies, C.J., dissenting) (emphasis in original).

Defendants' other cases similarly do not establish that the government must prove a latent defect before the contractor must perform under the Disputes Clause. *See United Techs. Corp., Sikorsky Aircraft Div. v. United States*, 27 Fed. Cl. 393, 398-99 (1992) (without addressing the Disputes Clause, finding no latent defect in helicopter spindle); *Appeal of T.F. Scholes of Arkansas, Inc.*, ASBCA No. 5270, 59-1 BCA ¶ 2244 (without addressing the Disputes Clause, concluding that the government's actions had constituted final acceptance and finding no contractual obligation to perform additional work); *Appeal of Herley Industries, Inc.*, ASBCA No. 13727, 71-1 BCA ¶ 8888 (without considering whether the government could require pre-disputes process corrective action, determining that the government failed to prove latent defects that would excuse final acceptance of "load isolators").   Thus, in this case, where the Government had revoked final acceptance based on a latent defect, JJK was required to perform the work and seek equitable adjustment later, even if it disagreed with the Government's contention that there was a latent defect.

### B. Applicability of the Disputes Clause to VWI

Just as JJK was required to follow the Government's directive to replace the Nurse Call System, VWI was obligated under the Subcontract to adhere to the Disputes Clause and conduct such work upon the Government's request, even if it continued to dispute whether the Government was justified in requiring replacement. First, Article 8 of the Subcontract, the "Flow-Down Relationship" Clause, states that VWI is "bound to JJK in the same way JJK is to the Owner and/or General Contractor (GC) and shall bear all the rights and liabilities with respect to JJK as JJK has with respect to the Owner and/or GC." *Id.* at JJK_00550. More specifically, Article 19 of the Subcontract, entitled "Disputes," states, in relevant part, that if VWI gives notice of any claim or dispute arising "in whole or in part out of the Contract Documents or an act or omission of the Owner or GC," its rights "shall be determined solely by applicable provisions of such Contract Documents, including *any dispute procedures therein.*" Mot. Partial Summ. J., Ex. 4, at JJK_00551, ECF No. 32-3 (emphasis added). It also includes a flow-down provision specific to disputes, which states "Subcontractor, and its sureties, shall be bound to JJK to the same extent that JJK is bound to Owner and/or GC by the Contract Documents and by any decisions or determinations made under the Contract Documents by any board, court or arbitration panel." *Id.*

In *Seal & Company, Inc. v. A.S. McGaughan Company, Inc.*, 907 F.2d 450 (4th Cir. 1990), the United States Court of Appeals for the Fourth Circuit held that a subcontract incorporated the prime contract's Disputes Clause when the provision in the subcontract contained similar language: "In the case of any dispute between Contractor and Subcontractor, due to any action of Owner or involving the Contract Documents, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner, by the terms of the

Contract Documents, and by any and all preliminary and final decisions or determinations made thereunder . . . ." *Id.* at 453. In this case, because the "Contract Documents" include the Prime Contract, *see* Article 5(A)(2) of the Subcontract, Mot. Partial Summ. J., Ex. 4, at JJK_00549, the Disputes Clause contained in the Prime Contract would provide the procedures for resolving such a disagreement. That Clause requires that: "The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." Mot. Partial Summ. J., Ex. 1, at JJK_00445; 48 C.F.R. 52.233-1(b)-(d), (i). Thus, when VWI sent JJK its June 7 and June 14, 2013 letters, in which it disputed the Government's claim that replacement of the Nurse Call System was required because of latent defects, *see* Mot. Partial Summ. J., Exs. 14, 20, it had to adhere to the provisions of the Disputes Clause and was obligated first to perform the ordered work, and then to seek an equitable adjustment later.

Notably, Article 19 of the Subcontract contemplated this specific scenario and also provides that "[i]n the event that it is necessary to commence any action or proceeding against the Owner or GC to implement Subcontractor's rights as above described, then JJK agrees to, in its sole discretion, either initiate such proceeding on Subcontractor's behalf, or permit Subcontractor to initiate such proceeding in JJK's name, upon Subcontractor's written request." Mot. Partial Summ. J., Ex. 4, at JJK_00551. Accordingly, in its letter forwarding the Government's order to VWI, JJK explained that it was "aware of the factual, contractual and legal defenses" available to both JJK and VWI and stated that if either party "incurs additional costs as a result of the Government's actions, we intend to submit (and will permit VWI to submit as a pass-through) a request for equitable adjustment, and a subsequent claim if

necessary." Mot. Partial Summ. J., Ex. 23, at JJK_00718-19.  Thus, relief was available to VWI in the form of a pass-through claim for equitable adjustment.

VWI argues that under *United States for Use of B's Co. v. Cleveland Electric Co. of South Carolina* 373 F.2d 585 (4th Cir. 1967), it was not under any obligation to perform additional work under the Subcontract.  In that case, the Fourth Circuit held that a prime contractor who had re-performed work as required by the government was not permitted to back-charge the subcontractor because "[h]aving properly performed and having had its work inspected and approved by both the prime contractor and the Government, the subcontractor was entitled to collect his money and go about his business." *Id.* at 588.  Although that subcontract contained a general flow-down clause similar to Article 8 in the JJK-VWI Subcontract,[2] the court interpreted that language only "to cover the quality and manner of performance of the subcontractor, not the rights and remedies between the prime contractor and the subcontractor," and therefore "the obligation to pursue and to exhaust the administrative remedies provided in the disputes article of the prime contract is the prime contractor's obligation, and any conflict between these divergent remedies constitutes a business risk which the parties incur by virtue of their different contracts." *Id.* at 588.

By contrast, the language in the JJK-VWI Subcontract is significantly more explicit in expressing the intent of the parties for VWI to be bound by the Disputes Clause.  In addition to the general flow-down provision in Article 8, it contains Article 19 relating to "Disputes," which contains (1) a separate flow-down provision specific to disputes; (2) an explicit requirement that

---

[2] Although the court did not quote the text of the provision, it noted that the text was identical to the subcontract clause in *Fanderlik-Locke Co. v. United States ex rel. Morgan*, 285 F.2d 939 (10th Cir. 1960), which stated that the subcontractor would be bound to the contractor "by the terms of the Agreement, General Conditions, Drawings, and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents assumes toward the Owner," *id.* at 942.  *B's Co.*, 373 F.2d at 588.

disputes be addressed through "the Contract Documents, including *any dispute procedures therein*"; and (3) a statement that, upon a dispute, JJK may agree to initiate a formal claim with the Government "on Subcontractor's behalf, or permit Subcontractor to initiate such proceeding in JJK's name." Mot. Partial Summ. J., Ex. 4, at JJK_00551 (emphasis added). Such references are sufficient to establish that the Disputes Clause was incorporated into the subcontract. *See Seal & Co.*, 907 F.2d at 454. Indeed, in *Granite Computer Leasing Corp. v. Traveler's Indemnity Co.*, 894 F.2d 547 (2d. Cir. 1990), the United States Court of Appeals for the Second Circuit found that the Disputes Clause of the prime contract applied to the subcontractor based on "the subcontract's detailed provisions for submission of excusable delay claims to the government," an even less direct reference to incorporating the prime contract's Disputes Clause than is at issue here. *Id.* at 550 (concluding that the subcontractor was therefore obligated to submit its claim and then "continue its performance under the contract pending resolution of its claim"). Thus, VWI was required to undertake the replacement of the Nurse Call System, even if it believed the Government's claim of a latent defect to be erroneous.

### C. Cardinal Change

VWI argues that even if the Disputes Clause is applicable, VWI was not required to replace the Nurse Call System because the SimplexGrinnell system installed after it refused to perform the correction "represents a material and wholesale change to the scope of work," and therefore constitutes a "cardinal change." VWI's Mot. Summ. J. at 18-19. In government contracts, a cardinal change to a contract is one in which "the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978). If the government orders such a drastic change, that

18

cardinal change "constitutes a material breach of the contract" and "has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause." *Alliant Techsystems*, 178 F.2d at 1276.

There is ample evidence in the record to support JJK's argument that there was no cardinal change. The Task Order issued by the Government to JJK under the Prime Contract did not specifically require the installation of a Nurse Call System of a particular make or model. Rather, it required the installation of a system meeting certain requirements. *See* Mot. Partial Summ. J., Ex. 2, at JJK_00918-31. The Government's letters to JJK support the view that the Government was seeking a system to meet the existing requirements, not a new set of requirements. When the Government ordered the replacement of the Nurse Call System, it stated that "[t]he Government will not accept any repair plan and the Government demands a replacement of the system," that JJK was "ordered to . . . replace the system at no additional cost to the government," and that the Government required a "commitment to a fully operational system that meets or exceeds all elements of the existing task order." Mot. Partial Summ. J., Ex. 15, at JJK_00663. On June 28, 2013, the Government directly ordered JJK to remove the system and "replace it with a new system conforming to the task order requirement." Mot. Partial Summ. J., Ex. 24, at JJK_00749. Nothing in these letters shows any action by the Government to require a system with different or better capabilities than required by the original contract, nor did VWI identify any such evidence in its Motion or at the hearing. When JJK, in turn, sought to require VWI to perform, it likewise did not demand a different or better system. Rather, it stated that the Contracting Officer had directed JJK "to proceed with replacement of the nurse call system," directed VWI to "comply with [those] directions," and sought

confirmation of VWI's "intent to proceed with the replacement." Mot. Partial Summ. J., Ex. 18, at JJK_00687.

Although VWI now asserts that the SimplexGrinnell system actually installed is "quite different" from VWI's, that it "has different parts and configurations," and that it "was not installed per these requirements" in the original work plan, VWI's Cross Mot. Summ. J. at 18-19, there is no evidence that the Government specifically demanded that particular system. Rather, JJK needed to identify another system that met the original contract requirements. *See* Mot. Partial Summ. J., Ex. 29. It was only after JJK determined on December 2, 2013 that VWI was in default for refusing to perform the ordered placement, Mot. Partial Summ. J., Ex. 31, ECF No. 32-5, that JJK presented the SimplexGrinnell system to the Government, which then issued its notice to proceed with installation of that system. Mot. Partial Summ. J., Ex. 34, ECF No. 32-5. Because there is substantial evidence that the Government did not order a "cardinal change," VWI's Motion for Summary Judgment on this issue is denied.

At the same time, the record does not lead to a definitive conclusion that there was no cardinal change. "The existence of a cardinal change is principally a question of fact, requiring that each case be analyzed individually in light of the totality of circumstances." *Allied Materials*, 569 F.2d at 565. As noted above, VWI has asserted that the SimplexGrinnell system selected as a replacement for its system is a "material and wholesale change to the scope of work." Decl. Robert D. Vincent ¶ 6, ECF No. 34-2. Although the Government did not dictate the selection of the SimplexGrinnell system in any of its letters ordering that the system be replaced, it also appears that JJK did not move forward with installing the SimplexGrinnell system without first presenting it to the Government and seeking its approval through a Notice to Proceed, and then providing an initial project schedule for the Government's review. Mot.

Partial Summ. J., Ex. 34, at JJK_00779, ECF No. 32-5.  Thus, based on the limited record before the Court, it is not clear whether the Government, while claiming to seek only a comparable system meeting the original requirements, in fact required significantly more from JJK in this second attempt.  Under these circumstances, the Court is reluctant to conclude in favor of JJK that there is no genuine issue of material fact on the issue of cardinal change.  *See Becho*, 47 Fed. Cl. 595, 604-05 (finding a genuine issue of material fact as to whether the government's post-acceptance order to remove nonconforming material from a pile of rocks constituted a cardinal change because the requirement to re-sort the pile could have been a drastic and unreasonable change).  Furthermore, any fair adjudication of this issue would require participation by the Government and would more appropriately proceed after a proper claim has been asserted against the Government and a contracting officer renders a decision on the claim.  Thus, although the record appears to support a finding that there was no cardinal change, the Court will not rule that JJK is entitled to judgment as a matter of law on the issue of cardinal change at this time.

### D. Damages

In its Motion for Partial Summary Judgment, JJK seeks judgment solely on liability, not on damages.  In its Motion for Summary Judgment, however, VWI argues that summary judgment should be awarded in its favor on the issue of damages because JJK cannot prove its damages with the required "reasonable certainty" because, as there has not yet been a determination that there was in fact a latent defect, any alleged damages are "speculative." VWI's Cross Mot. Summ. J. at 19-20.  Under Maryland law, the non-breaching party in a breach of contract action may recover damages for (1) the losses proximately caused by the breach; (2)

that were reasonably foreseeable; and (3) that have been proven with reasonable certainty. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 907 (Md. 1978).

For the reasons explained above, absent a cardinal change, the Subcontract required VWI to perform the system replacement ordered by the Government, regardless of whether the Government had established a latent defect at the time. The question whether there was, in fact, a latent defect, would be a proper subject of a claim by JJK, on behalf of VWI, for an equitable adjustment against the Government under the terms of the Subcontract. In this proceeding, even though JJK is not seeking summary judgment on the issue of damages, by establishing that VWI would be in default absent a cardinal change, and by providing evidence of JJK's outlay of funds to enter into a subcontract with SimplexGrinnell to do the replacement work that VWI refused to do, *see* Opp. First National's Cross Mot. Summ. J., Ex. C ¶ 7-8, ECF No. 40-3, it has shown a genuine issue of material fact on whether it incurred damages. The precise amount of damages is likely best determined after VWI, through JJK, pursues its claim against the Government and receives a determination on the question of whether there was, indeed, a latent defect justifying the Government's order of a new Nurse Call System. That determination would inform whether and in what amount VWI owes damages to JJK. Thus, VWI's motion for summary judgment on the issue of damages is denied.

## IV.  JJK and First National's Cross Motions Regarding the Performance Bond

### A.  Standing

As a preliminary matter, First National argues that judgment should be entered in its favor because "JJK Group, Inc." was not named in the Performance Bond as the obligee, and JJK has not shown that it is otherwise an heir, executor, administrator, or successor to "John J. Kirlin,

Inc.," the entity named in the Performance Bond.  First National's Cross Mot. Summ. J. at 16-17.
First National argues that JJK thus lacks standing to bring suit.

JJK has presented evidence that in October 2006, John J. Kirlin, Inc. changed its name to
JJK Group, Inc., and has attached the Articles of Amendment of the Articles of Incorporation
memorializing this change.  Opp. First National's Cross Mot. Summ. J., Ex. A at 4, ECF No. 40-
1.   Furthermore, JJK's General Counsel and Assistant Secretary has submitted a sworn
declaration explaining that "JJK Group, Inc." and "John J. Kirlin, Inc." are the same legal entity,
with the same State of Maryland entity identification number and the same Federal Employer
Identification Number.  Mitchell Decl. ¶ 7, ECF No. 40-1.  First National has not presented any
evidence contesting the validity or accuracy of these documents.  The Court is therefore satisfied
that JJK properly brings this case. *Cf. Fawick Corp. v. Alfa Export Corp.*, 135 F. Supp. 108, 109
(S.D.N.Y. 1955) (explaining that a corporation's name change after commencing an action did
not affect its standing to prosecute the action even though it failed to notify the Secretary of State
of the change).  Because the evidence shows that JJK Group, Inc. is, in fact, the same entity as
John J. Kirlin, Inc., First National's motion for summary judgment on this issue is denied.

### B. First National's Obligation to Cure

If VWI is found to be in default on the Subcontract, First National would be obligated to
cure the default under the Performance Bond.  Under Maryland law, the liability of the surety is
"coextensive with that of the principal."   *Atl. Contracting & Materials Co., Inc. v. Ulico
Casualty Co.*, 844 A.2d 460, 468 (Md. 2004).  Thus, the surety is "primarily or jointly liable with
the principal and, therefore, is immediately responsible if the principal fails to perform."  *Id.*
Here, the terms of the Performance Bond state that: "Whenever Principal shall be, and be
declared by Obligee to be in default under the subcontract," First National is required to

"promptly remedy the default" or arrange for the performance of the obligation under the Subcontract. Mot. Partial Summ. J., Ex. 5, at JJK_01010. For the reasons discussed above, *see supra* Part III. B., in the absence of a cardinal change, VWI was obligated to perform the replacement work that the Government ordered, so VWI would have been in default on the Subcontract when it refused to replace the Nurse Call System. As a matter of law, if VWI was liable for refusing to perform, First National would be obligated to cure the default.

In its Motion for Summary Judgment, First National asserts that its obligations under the Performance Bond were null and void upon the Government's final acceptance of the original Nurse Call System. This argument fails because courts applying Maryland law have recognized that surety obligations can extend beyond acceptance and final payment. For example, in *Hagerstown Elderly Assocs. Ltd. P'ship v. Hagerstown Elderly Bldg. Assocs. Ltd. P'ship*, 793 A.2d 579 (Md. 2002), the Maryland Court of Appeals permitted as timely filed a claim under a performance bond for a construction defect uncovered over eleven years after final payment. *Id.* at 581-83, 586-88. Likewise, in *Presidents & Dirs. of Georgetown College v. Madden*, 505 F. Supp. 557 (D. Md. 1980), the court concluded that a college's claim against a surety based on a defect discovered ten years after project completion and final payment was timely filed. *Id.* at 562-68.

In support of its argument, First National chiefly relies on *Hartford Accident & Indemn. Co. v. Scarlett Harbor Assocs., LP.*, 674 A.2d 106 (Md. Ct. Spec. App. 1996), in which the court quoted from a performance bond stating "if Principal shall promptly and faithfully perform this subcontract, this obligation shall be null and void," the court reached the unremarkable conclusion that if the principal "performed its contract," the surety's obligations would be "null and void." *Id.* at 143. This discussion of the contract was tangential to the central issue in that

24

case, whether an arbitration clause in a subcontract was incorporated into the bond, such that a dispute with the surety was subject to arbitration. *Id.* at 142-43. The cited language, which was little more than a quotation from the bond at issue, did not in any way establish a rule of Maryland law that a performance bond is extinguished upon the completion of the project. *Id.* at 143. In any event, even under the cited language, which largely mirrors the language in the First National Performance Bond, the operative issue is whether VWI had, in fact, completed performance when the Government revoked its acceptance based on a latent defect. As discussed above, it had not.

First National also cites to *Kiva Construction and Engineering, Inc. v. International Fidelity Insurance Co.*, 749 F. Supp. 753, 755 (W.D. La. 1990) and *Independent School District No. 74 v. Shurtleff-Gaharan, Inc.*, No. Civ-06-523, 2007 WL 2248159 (E.D. Okla. Aug. 2, 2007) as cases in which federal district courts have found a surety's obligations nullified by the completion of the project. These cases, however, do not apply Maryland law and are factually distinguishable. In *Kiva*, the performance bond contained a suit limitation clause, which provided that "[a]ny suit under this bond must be instituted before the expiration of two years from the date on which final payment under the contract falls due," which the court found to bar a suit filed after that time period, even though the contract itself had a ten-year warranty on the work. 749 F. Supp. at 755-56. In *Shurtleff-Gaharan*, the district court held that a surety had been released from its performance bond where that specific bond stated that it would be nullified upon "proper and prompt completion of the work," which the court interpreted to mean "physical completion" rather than "perfect completion." 2007 WL 2248159, at *1. Here, the bond does not contain any specialized language similar to that of *Kiva* or *Shurtleff-Gaharan*. The Performance Bond states that "if the Principal shall promptly and faithfully perform said

subcontract, then this obligation shall be null and void; otherwise to remain in full force and effect." Mot. Partial Summ. J., Ex. 5, at JJK_01010, ECF No. 32-3.

Because VWI was required to perform absent a cardinal change, there is a genuine issue of material fact on whether VWI was in default on the Subcontract. Having found that First National would remain responsible for curing such a default, the Court denies summary judgment to First National.

### C. Advisory Opinion

First National also argues that the Court should grant judgment in its favor because ruling on JJK's Motion for Partial Summary Judgment would amount to an impermissible advisory opinion. A federal court's Article III powers do not permit the court to issue advisory opinions based on a "hypothetical state of facts." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971). First National argues that because all parties involved believe there were no latent defects in the Nurse Call System that VWI initially installed, JJK's claims against VWI and First National are "premised entirely upon uncertain potential future liability determinations that cannot be rendered based on the undisputed facts of this case." First National's Cross Mot. Summ. J. at 16. First National thus claims that a ruling by the Court would be based on hypothetical facts and therefore amount to an impermissible advisory opinion. *Id.*

However, this case does not turn on the question whether there was, in fact, a latent defect in the Nurse Call System. Rather, the question is whether VWI was in default on the Subcontract when it refused to proceed on the Government's orders to replace Nurse Call System, regardless of whether an actual latent defect existed at the time. As discussed above, the Court finds, based on the terms of the Subcontract and the undisputed facts, that the Disputes Clause applies to VWI, and that it would be in default and liable to JJK, unless it can establish that there

was a cardinal change.   Thus, the Court's ruling is not an advisory opinion based on "hypothetical facts."   The remaining questions of whether the Government was justified in requiring performance based on a latent defect and whether the Government's order to replace the system constituted a cardinal change are not appropriately answered here, but should be pursued through the designated government contract disputes process through a claim against the Government by VWI, as passed through JJK pursuant to the Subcontract. Mot. Partial Summ. J., Ex. 4, at JJK_00551.

## CONCLUSION

For the foregoing reasons, JJK's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. The Court grants summary judgment to JJK to the extent that it finds as a matter of law that the Disputes Clause applied to VWI, and the Performance Bond remained in effect, following the Government's revocation of final acceptance, but denies summary judgment on the liability of VWI and First National because there remains a genuine issue of material fact on whether the Government's order to perform constituted a cardinal change. Defendant VWI's Motion for Summary Judgment is DENIED, and Defendant First National's Cross Motion for Summary Judgment is DENIED.  A separate Order follows.

Date:   March 27, 2015

THEODORE D. CHUANG
United States District Judge